UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
ANA BEATRIZ LONTRA JOBIM,           :
MARIA LUIZA HELENA LONTRA           :        Case No. 05 Civ. 3527 (PAC)
JOBIM, PAULO HERMANNY JOBIM         :
and ELIZABETH HERMANNY JOBIM,       :
                                    :
              Plaintiffs,           :
                                    :
            - against -             :
                                    :
SONGS OF UNIVERSAL, INC.,           :
                                    :
              Defendant.            :
-------------------------------------------------------x

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

John J. Rosenberg
Matthew H. Giger
ROSENBERG & GIGER P.C.
488 Madison Avenue, 10th Floor
New York, New York  10022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................iii

INTRODUCTION.........................................................................................1

THE FACTS...............................................................................................3

    A. The Sub-Publishing Agreements..............................................................3

    B. The Heirs' Claims in this Action..............................................................4

    C. The JM Agreement and Related Agreements................................................5

    D. Defendant's Rule 17(a) Objection............................................................7

    E. The Heirs' Procedural Codes..................................................................7

ARGUMENT..............................................................................................9

I.  Summary Judgment Standard and Burdens of the Parties..................................9

II.  The Heirs, not Jobim Music, are the Real Parties in Interest............................10

    A. Ownership of the Contract Rights, not the Copyrights, is at Issue....................10

    B. The JM Agreement Did Not Assign Any Rights Under the Sub-Publishing
       Agreements....................................................................................12

       i.     Under Brazilian Law, the JM Agreement Did Not Assign Any Rights
              that May Be Relied Upon by Universal.............................................12

       ii.    On Its Face, The JM Agreement Does Not Assign the Sub-Publishing
              Agreements.............................................................................13

       iii.   The Evidence of the Intent of Clause Three is Undisputed....................15

    C. The "Subsequent Conduct" Asserted By Universal Provides no Support for
       Universal's Contention that the Jobim Music Agreement Assigned Jobim's
       Contract Rights Under the Sub-Publishing Agreements................................16

III.  At Most, Issues of Material Fact Exist Concerning the Heir's Status as Real
      Parties in Interest..............................................................................17

IV.  Any Issue Concerning the Heirs' Status As Real Parties in Interest Was
      Waived or Has Been, or May Be, Cured Under Rule 17(a)............................18

i

A.  Rule 17(a)……………………………………………………………..18

B.  Universal Waived Its Right to Raise The Real-Party-In-Interest Issue…..…….19

C.  The Heirs and JM Have Cured Any Real-Party-In-Interest Defect…………….19

D.  The Rules Enabling Act Does Not Preclude Plaintiffs from Utilizing
     Rule 17(a)'s Cure Provisions……...…………………………………………..20

     i.      Rule 17(a) Applies Because Standing Is Procedural…..………………..21

     ii.     Universal's Case Authority Is Inapposite…………………………....…21

CONCLUSION…………………………………………………………………..24

# TABLE OF AUTHORITIES

## CASES

Am. Dredging Co. v. Fed. Ins. Co., 309 F. Supp. 425 (S.D.N.Y. 1970)................18, 23

B.R.I. Coverage Corp. v. Air Canada, 725 F. Supp. 133 (E.D.N.Y.
    1989)..........................................................................................................19, 23

Beitzell & Co. v. Bacchus Selections, Inc., No. 84 Civ. 1180-CSH, 1985 U.S. Dist.
    LEXIS 18025 (S.D.N.Y. 1985)...........................................................18

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .............................................9

Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29 (2d Cir. 1994)............................9

Contractual Obligations Prods. v. AMC Networks, Inc., 04 Civ. 2867 (S.D.N.Y. Mar.
    31, 2006)...........................................................................11

Del Re v. Prudential Lines, Inc., 669 F.2d 93 (2d Cir. 1982)..............................23

Del. & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174 (2d Cir. 1990).............9

Eden Toys, Inc. v. Florelee Undergarment Co., 697 F.2d 27 (2d Cir. 1982)..............23

Fox v. McGrath, 152 F.2d 616 (2d Cir. 1945)..............................................19

Gen. Motors Corp. v. Courier Servs., Inc., 77 Civ. 6128, 1978 U.S. Dist. LEXIS
    16120 (S.D.N.Y. 1978).....................................................................21

Hanna v. Plumer, 380 U.S. 460 (1965).................................................20, 21

Hayes v. Carlin America, Inc., 168 F. Supp. 2d 154 (S.D.N.Y. 2001)....................11

Hess v. United States Surgical Corp., No. C 99-2118 MJJ, 1999 U.S. Dist. LEXIS
    12658 (N.D. Cal. 1999)......................................................................21

Kelly v. Crown Equip. Co., 970 F.2d 1273 (3d Cir. 1992)................................21

Lapides v. Doner, 248 F. Supp. 883 (E.D. Mich. 1965)....................................21

MacMillan, Inc. v. Fed. Ins. Co., 741 F. Supp. 1079 (S.D.N.Y. 1990)...................23

Midwest Fin. Acceptance Corp. v. SE-Fish Assocs., 2000 U.S. Dist. LEXIS 7920
    (W.D.N.Y. 2000)............................................................................21

N.Y. State Law Officers Union v. Andreucci, 433 F.3d 320 (2d Cir. 2006)...............17

Nat'l Sugar Refining Co. v. Ma's Old Fashioned Root Beer, 23 B.R. 726 (Bankr.
    S.D.N.Y. 1982).......................................................................................18

Ruttenberg v. Davidge Data Sys. Corp., 215 A.D.2d 191, 626 N.Y.S.2d 174
    (1st Dep't 1995)....................................................................................17

Saybolt Int'l B.V. v. Schreiber, 279 F. Supp. 2d 337 (S.D.N.Y. 2003).....................22

Schering Corp. v. Home Ins. Co., 712 F.2d 4 (2d Cir. 1983)..................................9

Scheufler v. General Host Corp., 126 F.3d 1261 (10th Cir. 1997)......................21, 23

Sharp v. Patterson, 03 Civ. 8772 (GEL), 2004 U.S. Dist. LEXIS 22311
    (S.D.N.Y. Nov. 3, 2004)........................................................................11

Sparaco v. Matusky, 313 F. Supp. 2d 247 (S.D.N.Y. 2004)...................................11

Steger v. Gen. Elec. Co. 318 F.3d 1066 (11th Cir. 2003)........................................19

Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal
    Van Saybolt International B.V. v. Schreiber, 407 F.3d 34 (2d Cir. 2005).....21, 23

TeeVee Toons, Inc. v. Gerhard Schubert GmbH, 00 Civ. 5189 (RCC), 2006 U.S. Dist.
    LEXIS 59455 (August 22, 2006)..............................................................9

United States for the Use and Benefit of Wulff v. CMA, Inc., 890 F.2d 1070 (9th
    Cir. 1989)............................................................................................23

Wells Fargo N.W. Bank v. Varig S.A., 02 Civ. 6078 (JSR), 2003 U.S. Dist. LEXIS
    10812 (S.D.N.Y. 2003)......................................................................22, 23

Whelan v. Abell, 953 F.2d 663 (D.C. Cir. 1992)...........................................18, 19

## STATUTES AND RULES

Fed. R. Civ. P. (17) (a)...............................................................................passim

28 U.S.C § 2072........................................................................................20

Plaintiffs Ana Beatriz Lontra Jobim, Maria Luiza Helena Lontra Jobim, Paulo Hermanny Jobim and Elizabeth Hermanny Jobim (collectively, "plaintiffs" or the 'Heirs") submit this memorandum in opposition to the Motion for Summary Judgment filed by defendant Songs of Universal, Inc. ("Universal").

## INTRODUCTION

In this action, plaintiffs, the heirs of the late Brazilian composer and musician Antonio Carlos Jobim ("Jobim"), seek redress for Universal's numerous, material breaches of certain Sub-Publishing Agreements entered into in the 1960s by Jobim and Universal's predecessors in respect of a number of compositions authored or co-authored by Jobim (the "Sub-Publishing Agreements"). With scant support, Universal asserts in its motion that the Heirs are not the "real parties in interest" as, in Universal's view, they did not inherit Jobim's rights under the Sub-Publishing Agreements upon his death in 1994 - - implying that both the Heirs and Universal have conducted their affairs incorrectly for well over a decade. Universal's bold pronouncement rests entirely on its contortionist interpretation of a single Portuguese-language agreement, governed by Brazilian law, that was executed in Brazil in 1993 by Jobim Music Ltda. ("JM") and Jobim (the "JM Agreement"). In short, Universal argues that Jobim assigned the rights at issue in this litigation to JM in the JM Agreement, and that JM, and not the Heirs, is thus the proper plaintiff.

As demonstrated below, Universal's interpretation of the JM Agreement is simply wrong, and its steadfast refusal to accept JM's ratification of the Heirs' prosecution of this action or JM's offer to be joined as co-plaintiff reveals its motion to be a transparent procedural ploy through which Universal hopes to avoid a substantive adjudication of its contractual breaches.

As set forth in the contemporaneously filed declarations of Dr. Newton Silveira ("Silveira Decl.") and Mr. Sergio Kós Chermont de Britto ("Chermont Decl."), the JM Agreement is not effective against third parties such as Universal because it was not registered with Brazilian copyright authorities. Moreover, even if the agreement was effective under Brazilian law, it did not

transfer to JM either (a) ownership of Jobim's copyrights in his compositions; or, more importantly in the context of this breach of contract action, (b) Jobim's contract rights under the Sub-Publishing Agreements at issue. In fact, the JM Agreement makes absolutely *no* reference to *any* contract rights, let alone (as Universal suggests) "on its face" assigning away Jobim's long-standing rights under the Sub-Publishing Agreements. (Def's Mem. at 10-11.)

Even if JM was the real-party-in-interest in this action (and it is not), Universal waived the issue through its protracted delay in bringing its present motion; and, in any event, the Heirs and JM have taken several curative measures that have mooted Universal's motion. In this regard, JM, which is owned and controlled entirely by the Heirs, filed a Ratification of the Heirs' commencement of this action, agreeing to be bound by any judgment, settlement or other resolution of the litigation, thus negating any legitimate concerns that Universal may have had regarding the Heirs' role as plaintiffs. (Giger Decl., Ex. 1.) But Universal was not satisfied, feigning some unexpressed concern with the Ratification. To further assuage Universal's supposed discomfort, the Heirs' offered to join JM as a party to the action, but Universal again professed dissatisfaction with, and inexplicably rejected that solution.

Finally, JM and the Heirs recently entered into a "Qualified Assignment of Rights" in which JM, while continuing to aver that it does not own Jobim's copyrights or contract rights, transferred and assigned back to the Heirs any such rights (and any claims against Universal in this action) that JM "does, or arguably may possess." (Giger Decl., Ex. 9.) If Universal is unwilling to accept this latest, and most definitive cure, its pending motion will be further revealed as motivated not by legitimate concerns about multiple lawsuits, but by unabashed procedural gamesmanship.

The Court should find that the Heirs inherited Jobim's rights under the Sub-Publishing Agreements upon Jobim's death and are the real parties in interest. In the alternative, the Court should hold that the Heirs and JM have cured any supposed real-party-in-interest defect through the

Ratification and the "Qualified Assignment," or that they can readily do so by joining JM as a plaintiff. At a minimum, the Court should hold that Universal has, at best, raised a disputed issue of fact as to whether the parties to the JM Agreement intended to assign the Sub-Publishing Agreements to JM. Under any of these alternative dispositions, the Court properly should deny Universal's summary judgment motion.

## THE FACTS

A.   The Sub-Publishing Agreements.

Between 1962 and 1968, Jobim entered into a number of separate Sub-Publishing Agreements with Universal's predecessors-in-interest (Universal and its predecessors will, for ease of reference, be referred to herein as "Universal"), in respect of certain songs that he authored or co-authored (the "Compositions"). In the Sub-Publishing Agreements, Jobim granted Universal limited rights to administer, license and otherwise exploit the Compositions in certain specific geographic territories. (See Bart Decl., Ex. B.)[1] In exchange, the Sub-Publishing Agreements conferred certain rights on Jobim (the "Contract Rights"), including, *inter alia*, (a) the right to receive royalties and other amounts generated from Universal's exploitation of the Compositions in the covered territories; (b) the right to consent to, or reject, new adaptations and arrangements of the Compositions, or proposed licenses for film and television; and (c) the right to terminate the Sub-Publishing Agreements in the event of Universal's uncured breach. (See id.) The Sub-Publishing Agreements do not transfer to Universal any interest in the copyrights in the Compositions, which were retained by Jobim.

---

[1] Exhibit B to the Bart Declaration is an example of one of the Sub-Publishing Agreements at issue in this case. With the exception of the territories covered and the contract dates, the terms of the Sub-Publishing Agreements for the remainder of the Compositions are substantively identical in all material respects.

B.      The Heirs' Claims in this Action.

In this action, the Heirs allege that Universal breached the Sub-Publishing Agreements in a number of ways, including: (1) by underpaying royalties, license fees and other amounts generated by the exploitation of the Compositions; (2) by exploiting the Compositions in territories in which Universal possesses no rights;  and (3) by improperly purporting to transfer co-administration and other valuable rights under the Sub-Publishing Agreements, including rights that Universal itself does not possess, to the English-language lyricist for certain of the Compositions, Norman Gimbel. (Bart Decl., Ex. A, Am. Compl. ¶ 34, 40, 51.)  Based on these allegations, the Heirs assert claims for breach of contract and seek a declaratory judgment that the Sub-Publishing Agreements have been properly terminated.  (Id. ¶¶ 32-58.)

In their First Amended Complaint, the Heirs specifically allege that they inherited the Contract Rights that they are enforcing in the litigation: "Jobim died on December 8, 1994, and plaintiffs thereafter succeeded to his rights in the Compositions and under the [Sub-Publishing] Agreements." (Id. ¶ 31.)  In his "Public Will," probated in Brazil, Jobim left "the available portion of his property to his wife ANA BEATRIZ LONTA JOBIM, except for his copyrights, which will be divided in equal portions among his wife and his four children in a proportion of 20 percent (twenty per cent) for each." (Ana Jobim Aff., Ex. B at JOBIM 01449.)  Plaintiff Ana Jobim subsequently agreed to distribute the property that she alone had inherited from Jobim among the remaining Heirs in the same proportion governing their ownership of Jobim's copyrights.  (See Ana Jobim Aff. ¶¶ 12, 13 & Exs. C, D.)  Of particular note here, following Jobim's death, the shares of JM were distributed equally among the Heirs, and the Heirs thus became, and remain, the sole owners of JM. (Id. ¶ 13 & Ex. D at JOBIM 018606.)

C.    The JM Agreement and Related Agreements.

Jobim entered into the JM Agreement on or about September 15, 1993, approximately one

year prior to his death.  (Ana Jobim Aff., Ex. A at JOBIM 011371.)  Contrary to Universal's

assertions, the JM Agreement did not transfer to JM Jobim's copyrights in the Compositions or the

Contract Rights.

When the JM Agreement was conceived and executed, JM was owned jointly by Jobim

(99%) and plaintiff Ana Jobim (1%).  (Ana Jobim Aff. ¶ 2.)  At that time, Ms. Jobim discussed with

her husband the intent of the JM Agreement and the intended role of JM in Jobim's business affairs,

and she participated in the decision to make JM an administrator of Jobim's songs.  (Id. ¶ 3.)  The

undisputed testimony of Ms. Jobim - - the only witness with contemporaneous first-hand knowledge

of the issue - - is that the JM Agreement was intended simply to grant to JM the right to administer

and collect monies generated from the exploitation of Jobim's compositions in non-Universal

territories, which previously had resided with an individual located in Brazil; and that the JM

Agreement was not intended to effect a wholesale assignment of copyright or Contract Rights.  (Id.

¶¶ 4, 5.)  In other words, as the Heirs have repeatedly and consistently testified, the JM Agreement

was intended to make JM a publisher and collection agent for Jobim in territories that were not

controlled by Universal (or other parties), including Brazil and other South American countries.  (Id.

¶¶ 5, 6; Giger Decl., Ex. 6, Ana Jobim Tr. at 33, 37-38; Giger Decl., Ex. 7, Elizabeth Jobim Tr. at 42-

43.)

The language of the JM Agreement is fully consistent with the foregoing.  Thus, the JM

Agreement does not purport to transfer, and has never been interpreted by the Heirs to have

transferred, the Contract Rights or any ownership interest in Jobim's copyrights.  (Ana Jobim Aff.

¶ 5.)  Rather, the JM Agreement confirms that "the purpose of JOBIM MUSIC LTDA. is the

*management* of copyrights and related rights, and services rendered in the area of intellectual

property." (Ana Jobim Aff., Ex. A at JOBIM 011522; emphasis added.)  In furtherance of this limited administrative role, in the JM Agreement, Jobim "assigns and transfers" to JM (1) Jobim's "patrimonial copyrights [*i.e.,* the financial aspects] of all his musical work" (Clause One); and, as a natural concomitant thereto, (2) "all the amounts intended to him from the date of the execution of his assignment of rights . . . for the attainment of its purposes" (Clause Three).  (Id. at JOBIM 011523.)  "Patrimonial" rights under Brazilian law do not (as Universal incorrectly suggests) include ownership of the copyrighted work itself, the right to modify the work, or the right to maintain the integrity of the work.  (Chermont Decl. ¶ 11.)  Rather, patrimonial rights are limited to the right to exploit a copyrighted work for financial gain.  (Id.)  The JM Agreement was never registered with Brazilian authorities as an assignment of copyright.  (Ana Jobim Aff. ¶ 8.)

In early 1997, after Jobim's death, the Heirs entered into a second agreement with JM, which, instructively, is not mentioned in Universal's motion papers, entitled "Copyrights Management Service Agreement" (the "Second JM Agreement").  (Ana Jobim Aff. ¶ 14 & Ex. E.)  In the Second JM Agreement, the Heirs, who were then (and currently are) the sole owners of JM, confirmed JM's limited role as an administrator and manager of the intellectual property rights that the Heirs had inherited from Jobim, and still retained.  (Id. ¶ 15.)  Thus, the Second JM Agreement obliges JM, *inter alia,* to: "Manage the Copyrights resulting from all kinds of intellectual work of [Jobim] inherited by the [Heirs]"; "Collect and receive copyrights and related rights"; "Render monthly accounts" to the Heirs; and "Keep the [Heirs'] Copyrights accounting organized."  (Id., Ex. E.)  In return for its administration services JM is to be paid "15% . . . of the gross sum received by the [Heirs] as Copyrights payment."  (Id.)  The Second JM Agreement has never been terminated and remains in effect.  (Id.; Ana Jobim Aff. ¶ 15.)

It is undisputed that JM has never operated in conflict with the rights granted to Universal under the Sub-Publishing Agreements, whether under the JM Agreement, the Second JM Agreement

or otherwise. (Ana Jobim Aff. ¶ 6.) Rather, consistent with the purposes of each of those agreements, JM has acted as a publisher, manager and administrator of Jobim's Compositions only in territories in which Universal was *not* granted rights pursuant to the Sub-Publishing Agreements. (Id.) Moreover, during the 13 years that have elapsed since Jobim's death, no payments due under the Sub-Publishing Agreements have been paid by Universal to JM; they have been paid instead to "Antonio Carlos Jobim, c/o E.D. Lowenwarter Co." (Id. ¶ 7.)

D.    Defendant's Rule 17(a) Objection.

Universal first raised its objection to plaintiffs' status as the real parties in interest by letter dated October 24, 2006 - - some 18 months after the litigation was commenced and 10 months prior to the submission of its present motion. (Giger Decl., Ex. 4.) The Heirs responded on November 3, 2006, refuting Universal's strained construction of the JM Agreement and confirming that "the JM Agreement has no bearing on Jobim's rights under the Sub-Publishing Agreements, which are, of course, the only rights relevant to plaintiffs' standing." (Giger Decl., Ex. 5.) Nonetheless, in order to "address any concerns Universal may have regarding potential multiple litigations, judgments or similar issues," the Heirs confirmed to Universal that "Jobim Music will ratify the commencement of the action by plaintiffs, and plaintiffs and Jobim Music will stipulate, in a binding written document, that any judgment entered (or settlement reached) in this case also will bind Jobim Music." (Id. at 2.) Universal never responded to the Heirs' proposal.

E.    The Heirs' Procedural Cures.

While continuing to confirm that JM is not the real party in interest in the action, the Heirs and JM have taken multiple steps to cure any perceived real-party-in-interest defect. First, on or about January 5, 2007, JM filed a "Ratification pursuant to Fed. R. Civ. P. 17," in which JM writes that it "denies and disputes Universal's asserted position, and believes and avers that plaintiffs are the real party in interest." (Giger Decl., Ex. I ¶ 3.) Nonetheless, in the Ratification, "[i]n order to avoid

7

needless motion practice on the issue" - - an effort that obviously was unsuccessful - - JM "ratifies plaintiffs' commencement of this action and their assertion of claims and other exercise of any rights and remedies in this action." (Id. ¶ 5.)  To assuage any possible lingering concerns Universal might have on the issue, in the Ratification, JM "declares and confirms" that:

> any settlement reached or final judgment entered in this action on the claims asserted by plaintiffs herein shall be binding on and conclusive as to Jobim Music; that Jobim music will not institute a separate action against defendants arising out of the facts, or for the claims alleged in plaintiffs' Amended Complaint; and that Jobim Music will execute such other documents as may be necessary to effectuate this ratification.

(Id. ¶ 6.)  Universal has refused to accept JM's Ratification.

Second, in the face of Universal's rejection of the Ratification, and in a continuing effort to resolve the issue and deter Universal from filing the present motion, the Heirs offered to join JM as a plaintiff in this action.  (Giger Decl., Ex. 2.)  Universal rejected that proposal, asserting, rather obliquely, that "joining Jobim Music does not cure the problem."[2]  (Giger Decl., Ex. 3.)

Third, in a "belt and suspenders" measure, JM recently executed a Qualified Assignment of Rights with the Heirs (the "Qualified Assignment").  (Giger Decl., Ex. 9.)  In the Qualified Assignment, JM, while once again denying that it is the owner of Jobim's copyrights or the Contract Rights, but in order to "confirm" that fact "beyond dispute," has "transfer[red] and assign[ed]" to Heirs any such rights that it "does, or arguably may possess" and any related claims that JM may have against Universal.  (Id.)  Thus, even if JM did at one time possess rights that the Heirs are seeking to enforce in this action (and it did not), those rights - - and attendant claims - - have been transferred to the Heirs, who are now indisputably the real parties in interest.

---

[2] As discussed below (at n.8), Universal's own cited case authority undermines this position, and confirms that joinder is an adequate cure even when ratification is not available for prudential reasons.

8

**ARGUMENT**

Universal has failed to satisfy its burden to demonstrate the absence of disputed material facts on the real-party-in-interest issue and that it is entitled to summary judgment as a matter of law.

I.      Summary Judgment Standard and Burdens of the Parties.

The deficiencies in Universal's motion extend even to its articulation of the well-settled legal standards governing summary judgment. Universal endeavors to shift the evidentiary burden of its own motion to plaintiffs, stating that "in order to defeat summary judgment, [the Heirs] must show that the law allows" them "to continue to act as plaintiffs." (Def's Mem. at 2.) It is elementary, however, that Universal, not the Heirs, bears the heavy burden on its motion.

Specifically, Universal, as the moving party, must shoulder the initial burden of demonstrating that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. 56). Assuming that Universal had made such a showing (which is hardly the case), the Heirs, in turn, have the opportunity to demonstrate a genuine dispute as to the material facts, which will defeat summary judgment. Id.

In evaluating the evidence, the Court "must assess the record in the light most favorable to the non-movant, resolving all ambiguities and drawing all reasonable inferences in that party's favor." TeeVee Toons, Inc. v. Gerhard Schubert GmbH, 00 Civ. 5189 (RCC), 2006 U.S. Dist. LEXIS 59455, at *4 (S.D.N.Y. August 22, 2006) (citing Del. & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). "If . . . there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party, summary judgment is improper." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994); see also Schering Corp. v. Home Ins. Co., 712 F.2d 4, 9-10 (2d Cir. 1983) (same).

Universal seeks summary judgment on the asserted ground that the Heirs are not the "real party in interest" under Fed. R. Civ. P. 17(a) because, in Universal's view, Jobim assigned his copyrights and the Contract Rights to JM in the JM Agreement. As discussed below, the evidence of record - - including that relied upon by Universal - - demonstrates and confirms that the Heirs are the real parties in interest or, at the very least, that there exist disputed issues of material fact.[3] And, even if it were undisputed that the Heirs are not the real parties in interest (which is not the case), there nonetheless would be no basis for dismissal, as any such procedural defect has been cured through JM's Ratification, its offer to join the action as a co-plaintiff and the Qualified Assignment.

II.     The Heirs, not Jobim Music, are the Real Parties in Interest.

The foundation of Universal's motion is its assertion that the JM Agreement assigned to JM the same rights the Heirs seek to enforce in this action. In order to advance this assertion, Universal repeatedly (albeit incorrectly) avers that, in the JM Agreement, Jobim assigned to JM both his "contract rights and copyrights" in his Compositions. (Def's Mem. at 5, 9-12.) As discussed below, Jobim's copyrights are not at issue in these proceedings, and, therefore, whether they were assigned to JM (which they were not) is irrelevant. The only issue germane to Universal's motion is whether the JM Agreement assigned the Contract Rights to JM. The undisputed evidence demonstrates that it did not.

A.     Ownership of the Contract Rights, not the Copyrights, is at Issue.

This is an action for breach of contract only. The Heirs have not asserted any copyright claims against Universal. Whatever the reach and scope of the "patrimonial copyright" interests

_____

[3] Universal's motion is predicated in large part upon the Declaration of Andrew H. Bart, its counsel, and the exhibits thereto. Mr. Bart's declaration is improper, as it includes numerous statements of supposed fact as to which Mr. Bart clearly has no firsthand knowledge (e.g., "In the period preceding Jobim's death, Universal remitted Jobim's share of the royalties earned pursuant to the Agreement to E.D. Loewenwarter Co., an accounting firm retained by Jobim"; "because Jobim had already assigned his copyrights and contract rights to Jobim Music, these rights were not devised to Plaintiffs through Jobim's will"). (Bart Decl. ¶¶ 6, 10.) The Heirs hereby move to strike Mr. Bart's Declaration, and, to the extent Universal's motion relies on the improper averments contained in the Bart Declaration, the Heirs urge the Court to disregard them.

transferred to JM in the JM Agreement,[4] those rights are distinct from the Contract Rights under the Sub-Publishing Agreements that are at issue in this action - - Jobim plainly could transfer or assign the former while retaining the latter.[5]

Contract rights are "privately created rights distinct from . . . rights under copyright law." Sharp v. Patterson, 03 Civ. 8772 (GEL), 2004 U.S. Dist. LEXIS 22311, at * 25 (S.D.N.Y. Nov. 3, 2004); see also Sparaco v. Matusky, 313 F. Supp. 2d 247, 10-11 (S.D.N.Y. 2004) (characterizing plaintiff's copyright infringement and breach of contract claims as being predicated on "two distinct rights"). Because the rights are distinct, a party may transfer or assign his copyrights while continuing to possess contract rights related to the same copyrighted material. See, e.g., Contractual Obligations Prods. v. AMC Networks, Inc., 04 Civ. 2867 (BSJ)(HBP), 2006 U.S. Dist. LEXIS 16402, at * 15 (S.D.N.Y. Mar. 31, 2006) (holding that plaintiff assigned away copyright claims but continued to possess related claims for breach of contract); Hayes v. Carlin America, Inc., 168 F. Supp. 2d 154, 158 (S.D.N.Y. 2001) (treating royalty rights as contract rights that are distinct from copyrights and holding that "whether [plaintiff] transferred his royalty rights depends on the language of the transfer without reference to copyright rules").

Thus, even were the Court to accept Universal's assertion that Jobim transferred his copyrights to JM in the JM Agreement (which is not the case), that conclusion would be irrelevant.

---

[4] Universal's conclusory posturing notwithstanding, it is apparent that Jobim did not transfer ownership of his copyrights in the Compositions to JM in the JM Agreement. First, patrimonial copyrights are not copyrights in the sense that term is used in the United States Copyright Act, but, rather, refer only to the financial (not creative) benefits of a work of intellectual property. (Chermont Decl. ¶ 11.) Second, the Second JM Agreement confirms that the Heirs inherited and retained the copyrights in Jobim's works and that JM only received the right to manage and administer the same. (Ana Jobim Aff. ¶ 15 & Ex. E.)

[5] Universal's motion papers repeatedly conflate Jobim's patrimonial (i.e., financial) copyright interests and his separate contract rights, and improperly attempt to prove assignment of the latter based on evidence concerning the former. For example, Universal argues that "[p]laintiffs and the lawyer responsible for the Jobim Agreement have treated Jobim Music as if it is the owner of the copyrights in Jobim's works," and then avers that such conduct "confirms" the alleged assignment of "copyright and other property rights" to JM. (Def's Mem. at 12; emphasis added.)

11

Universal's motion turns on whether the distinct Contract Rights were transferred to JM pursuant to the JM Agreement. The undisputed evidence demonstrates that they were not.

> B.   The JM Agreement Did Not Assign Any Rights Under the Sub-Publishing Agreements.

Universal argues that Clause Three of the JM Agreement "on its face" assigns the Contract Rights to JM. (Def's Mem. at 10.) This argument is entirely without merit and is predicated on a distortion of the language of the JM Agreement. In fact, "on its face," Clause Three assigns "amounts," not contracts, specifically "amounts intended to [Jobim] from the date of the execution of his assignment of rights . . . for the attainment of its purposes." (Ana Jobim Aff., Ex. A.) For the reasons discussed below, the Court should find, as a matter of law, that Clause Three does not assign the Contract Rights.

> (i)   *Under Brazilian Law, the JM Agreement Did Not Assign Any Rights that May Be Relied Upon by Universal.*

Under Brazilian law, in order to be effective against third parties, copyright assignments must be registered with the appropriate Brazilian authorities. (Chermont Decl. ¶¶ 14-18; Silveira Decl. ¶¶ 3-5.) It is undisputed that the JM Agreement was never registered. (Ana Jobim Aff. ¶ 8.) As such, according to governing Brazilian law, the JM Agreement is merely a private understanding between Jobim and JM, with no effect *vis a vis* third parties. (Silveira Decl. ¶ 5.) For this reason, Universal may not rely on the purported assignment of rights within the JM Agreement, whether in ostensible support of its present motion or otherwise. (Chermont Decl. ¶ 18; Silveira Decl. ¶ 5.) As Universal's motion is based entirely on the unregistered and ineffective JM Agreement, the Court should deny Universal's motion on that basis without further analysis.

> (ii)   *On Its Face, The JM Agreement Does Not Assign the Sub-Publishing Agreements.*

Even assuming that the JM Agreement may be relied upon by Universal in support of its present motion, the JM Agreement plainly does not assign the Contract Rights to JM. Instructively,

the JM Agreement never once mentions the Sub-Publishing Agreements, and does not suggest that JM is to be the recipient of any rights under those Agreements. The JM Agreement is silent on the issue, and Universal cannot transform that silence into an affirmative assignment of rights that are not even mentioned.

Clause Three of the JM Agreement is far more limited in scope than Universal would have the Court believe. That Clause assigns to JM only "amounts" due "for the attainment of its purposes." (Ana Jobim Aff., Ex. A at JOBIM 011523.) The "purposes" of the JM Agreement are expressly identified in the Agreement as "the management [by JM] of the copyrights and related rights, and services rendered in the area of intellectual property." (Id. at JOBIM 011522.) Thus, Clause Three, by its very terms, is directly tied and limited to JM's management of the "patrimonial [i.e., financial] copyrights" assigned to it. In other words, in order to properly manage the "patrimonial" rights licensed to it, JM, quite unremarkably, is also expected to collect the "amounts" generated from those rights.

Under Brazilian law, conferring on a third party the right to administer and collect funds generated from the exploitation of a contract right is not the equivalent of an assignment of the underlying contract right itself. (Chermont Decl. ¶ 25; Silveira Decl. ¶ 12.) Thus, Clause Three of the JM Agreement, by assigning "amounts" cannot be read to assign the Sub-Publishing Agreements. Aside from finding support in Brazilian law, this result is logical: were it otherwise, any agent who is designated to collect monies due under a contract - - e.g., the manager of an apartment building who collects rent - - would, through such designation, be transformed into a direct party to the underlying agreements. That Jobim designated JM to collect certain amounts otherwise payable to JM - - "for the attainment" of the limited and express purposes of the JM Agreement - - does not assign any underlying contract rights to JM. (Chermont Decl. ¶ 24; Silveira Decl. ¶ 10.)

13

Moreover, even if the "amounts" referenced in Clause Three could be read to include contract rights in general, it could not be read to include the rights under the Sub-Publishing Agreements. When Jobim entered into the JM Agreement in 1993, he previously had granted to Universal, more than twenty years earlier in the Sub-Publishing Agreements, *exclusive* rights to exploit the Compositions in specified territories. Thus, by definition, the JM Agreement could not have effected an assignment to JM of rights for the Universal territories, for the simple, yet compelling reason that Jobim no longer possessed those rights when he entered into the JM Agreement. (Chermont Decl. ¶ 27.)

Even if the territory of the JM Agreement did overlap with Universal's territories (and it does not), that would not render Clause Three an assignment of the Sub-Publishing Agreements, as Universal suggests. Universal appears to be arguing that Jobim sold "Blackacre" twice, once to Universal in the Sub-Publishing Agreements and a second time to JM in the JM Agreement. If, as Universal suggests, the JM Agreement somehow assigned to JM rights in the Compositions in the Universal territories, that fact would make JM a *competitor* of Universal in those territories with respect to the exploitation of the Compositions, rather than a party to the Sub-Publishing Agreements. It would, at most, give Universal a cause of action against Jobim for the breach of the exclusivity provisions of the Sub-Publishing Agreements.

Moreover, if Jobim and JM had intended to make JM a party to the Sub-Publishing Agreements, they readily could (and would) have referenced the Sub-Publishing Agreements in Clause Three, as those Agreements had been in place for over twenty years at the time the JM Agreement was executed. But the JM Agreement does not even mention contract rights, let alone state that Jobim was transferring his longstanding Sub-Publishing Agreements to JM.

In short, a plain reading of Clause Three confirms that the JM Agreement did *not* embrace the Contract Rights that the Heirs are enforcing in this action.

14

### (iii)  *The Heirs' Evidence of the Intent of Clause Three is Undisputed.*

If the Court deems the foregoing to be non-decisive, Brazilian law permits the Court to examine extrinsic evidence to determine the intent of Clause Three.  The undisputed evidence proffered by the Heirs demonstrates that the JM Agreement was not intended to assign the Contract Rights to JM.

Like New York law, the goal of Brazilian contract law is to effectuate the intent of the parties.  (Chermont Decl. ¶¶ 21-22; Silveira Decl. ¶ 9.)  Brazilian law, however, looks to extrinsic evidence of the intent of the parties to determine the meaning of contract language whether that language is deemed clear or ambiguous.  (Chermont Decl. ¶ 21.)

The Heirs have testified that the JM Agreement was intended, and has consistently been interpreted - - by the Heirs and by JM - - to grant to JM only administration rights in the Compositions *outside* of the Universal territories.  (Ana Jobim Aff. ¶¶ 5-6; Giger Decl., Ex. 6, Ana Jobim Tr. at 33, 37-38; Giger Decl., Ex. 7, Elizabeth Jobim Tr. at 37, 40-42.)[6]  In addition, Ana Jobim - - who was an owner of JM when the JM Agreement was executed and had contemporaneous discussions concerning its intent - - has submitted an affidavit confirming that the JM Agreement was never intended to embrace the Sub-Publishing Agreements, the Contract Rights or the Universal territories.  (Ana Jobim Aff. ¶¶ 4-6.)  Moreover, JM has never attempted to exploit the Compositions or collect "amounts" in any territory granted to Universal in the Sub-Publishing Agreements.  (Id. ¶ 6.)  The Heirs' testimony on the issue stands undisputed.[7]

---

[6] The Second JM Agreement, executed by the Heirs after Jobim's death, also confirms this interpretation, and explicitly limits JM's rights to the "management" of the copyrights and related services.  (Ana Jobim Aff., Ex. E.)

[7] The reason for Universal's lack of contrary proof is self-evident.  If Jobim, the Heirs or JM intended that the JM Agreement assign the Sub-Publishing Agreements to JM, they most assuredly would have notified Universal that royalty payments under the Sub-Publishing Agreements should be redirected to JM.  Their failure to do so speaks volumes, and further confirms that, as written and as consistently interpreted and performed, the JM Agreement did not divest the Heirs of their rights under the Sub-Publishing Agreements.

C.    The "Subsequent Conduct" Asserted By Universal Provides No Support for
      Universal's Contention that the Jobim Music Agreement Assigned Jobim's Contract
      Rights Under the Sub-Publishing Agreements.

Universal asserts that certain "subsequent conduct" of JM - - *i.e.*, documents created after the

execution of the JM Agreement - - "confirm[s]" that JM, not the Heirs, is the real party in interest in

this action. (Def's Mem. at 11-12.) To the contrary, each of the "subsequent" documents cited by

Universal relates solely to JM's status as an administrator and manager of Jobim's compositions

outside of the Universal territories. Those documents are irrelevant to the central issue raised by

Universal's motion, *i.e.*, whether Clause Three of the JM Agreement assigned the Contract Rights to

JM.

The "subsequent" documents cited by Universal consist of (1) agreements with a few third-

parties that recite that JM is the "copyright owner" of Jobim's compositions and the "publisher of the

Compositions 'pursuant to agreement with ANTONIO CARLOS JOBIM'"; and (2) a valuation of

JM produced by a court-appointed accountant in connection with the probate of Jobim's will in

Brazil.

The recital of JM as "copyright owner" of certain compositions in one or two agreements

outside of the Universal territories has no bearing on Universal's pending motion. While that passing

reference likely concerns the "patrimonial copyrights" assigned in the JM Agreement, it indisputably

is *not* a reference to any interest of JM in the Contract Rights, the only relevant issue.

Similarly, Universal's observation that Jobim's estate "valuation included as part of the

assets of Jobim Music[ ], the amounts collected from the exploitation of Jobim's copyrights" (Def's

Mem. at 12) is similarly un-illuminating and irrelevant. The valuation "projected collection of

copyright rights" using as a "basis" JM's "monthly average collection in the period from September

1993 to December 1994." (Bart Decl., Ex. H at JOBIM 011343.) Because it is undisputed that JM

neither exploited the Compositions in the Universal territories nor received any payments from

16

Universal under the Sub-Publishing Agreements (Ana Jobim Aff. ¶¶ 6-7), those payments were not included in the "basis" of the valuation. As the valuation thus did not include amounts generated from the Contract Rights, it offers no support for Universal's assertion that JM is the assignee of those rights.

III.     At Most, Issues of Material Fact Exist Concerning the Heirs' Status
         as Real Parties in Interest.

Even if the Court declines to hold as a matter of law that the Heirs are the real parties in interest, it properly should deny Universal's motion because there is, at best, a significant and disputed issue of material fact. That issue is the intent of Clause Three of the JM Agreement. Because the intent of Clause Three reasonably may be interpreted in the Heirs' favor, summary judgment may not enter.

The interpretation of a contract is a question of law only when the language is "straightforward and unambiguous." Ruttenberg v. Davidge Data Sys. Corp., 215 A.D.2d 191, 192, 626 N.Y.S.2d 174, 175 (1st Dep't 1995). In contrast, when "the meaning of a particular contractual provision is ambiguous and the intent of the parties cannot be determined from the contractual language itself, the ambiguity presents a question of fact to be resolved by a jury." N.Y. State Law Officers Union v. Andreucci, 433 F.3d 320, 331 (2d Cir. 2006); see also Ruttenberg, 215 A.D.2d at 193 ("[W]hen the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment."). While, as discussed above, the Heirs assert that the JM Agreement, according to its plain language, did not assign the Contract Rights to JM, at most, the language and intent of Clause Three raise questions of fact that must be resolved by the jury. It is beyond dispute that a reasonable jury could find, on the basis of the Heirs' evidence, that it was not the intent of the JM Agreement to

make such an assignment.  Accordingly, on that alternative ground, the Court should deny

Universal's summary judgment motion.

IV.    Any Issue Concerning the Heirs' Status As Real Parties in Interest Was Waived or Has Been, or May Be, Cured Under Rule 17(a).

Universal, through its inexplicable delay, waived its right to raise the real-party-in-interest

issue.  In any event, the Heirs and JM have taken more than adequate steps to cure any real-party-in-

interest defect, including through the Ratification, the Qualified Assignment and their confirmed

willingness to join JM as a co-plaintiff in the action.  Universal's motion should be denied on this

ground as well.

A.    Rule 17(a).

Rule 17(a) is "procedural in nature."  Am. Dredging, 309 F. Supp. at 429.  It is not addressed

to constitutional standing or to the Court's subject matter jurisdiction.  See Whelan v. Abell, 953

F.2d 663, 671-72 (D.C. Cir. 1992) (holding that a Rule 17(a) defense may not be raised at any time

because it does not concern Article III standing or subject matter jurisdiction).  The Rule's

procedural purpose "is simply to protect the defendant against a subsequent action by the party

actually entitled to recover, and to ensure generally that the judgment will have its proper effect as

res judicata."  Beitzell & Co. v. Bacchus Selections, Inc., No. 84 Civ. 1180-CSH, 1985 U.S. Dist.

LEXIS 18025, at * 3 (S.D.N.Y. 1985) (quoting 1966 Advisory Committee Notes); Nat'l Sugar

Refining Co. v. Ma's Old Fashioned Root Beer, 23 B.R. 726, 728 (Bankr. S.D.N.Y. 1982) (same).

Reflective of its limited purpose, Rule 17(a) expressly sets forth the procedures by which a

party may "cure" any alleged real-party-in-interest defect:

> No action shall be dismissed on the ground that it is not prosecuted in the
> name of the real party in interest until a reasonable time has been allowed
> after objection for ratification of commencement of the action by, or joinder
> or substitution of, the real party in interest; and such ratification, joinder, or
> substitution shall have the same effect as if the action had been commenced in
> the name of the real party in interest.

Fed. R. Civ. P. 17(a).

      B.    <u>Universal Waived Its Right To Raise The Real-Party-In-Interest Issue.</u>

As stated above, Rule 17 is not directed to subject matter jurisdiction, and, in contrast to a subject matter jurisdiction defense, a real-party-in-interest defense may not be raised at any time in the proceeding. <u>Whelan</u>, 953 F.2d at 671-72. Universal waited for more than two years after the litigation was commenced, and nearly one year after it first notified the Heirs of the supposed real-party-in-interest issue, to file its present motion. Universal's significant and inexplicable delay in filing its motion - - after permitting the case to proceed through pleading and substantial discovery and requiring the Heirs to incur significant burden and expense - - constitutes a waiver that precludes Universal from belatedly raising the issue now. <u>See</u> <u>Steger v. Gen. Elec. Co.</u>, 318 F.3d 1066, 1080 (11th Cir. 2003) ("the real-party-in-interest defense . . . is not jurisdictional, but is, indeed, freely waivable") (quoting <u>Fox v. McGrath</u>, 152 F.2d 616, 618 (2d Cir. 1945)).

      C.    <u>The Heirs and JM Have Cured Any Real-Party-In-Interest Defect.</u>

Even if Universal has not waived the real-party-in-interest issue, the Heirs have cured any defect in multiple ways. <u>First</u>, in January of 2007, JM filed the Ratification, in which JM not only ratified the Heirs' commencement of this action, but expressly agreed to be bound by any settlement or judgment. (Giger Decl., Ex. 1 ¶ 6.) Such a ratification fully satisfies Rule 17(a). <u>See</u> <u>B.R.I. Coverage Corp. v. Air Canada</u>, 725 F. Supp. 133, 136-37 (E.D.N.Y. 1989).

<u>Second</u>, the Heirs have offered to join JM as a co-plaintiff pursuant to Rule 17(a). While the Heirs' offer was rejected by Universal, the Heirs remain prepared to join JM as a means of further curing any supposed real-party-in-interest defect.

<u>Third</u>, in a "belt and suspenders" measure that goes beyond the cure provisions of Rule 17(a), JM executed the Qualified Assignment, in which it "transfers and assigns" to the Heirs "any ownership or other interest in the Copyrights or Contract Rights that JM does, or arguably may

19

possess," and any "rights, legal claims or causes of action" related thereto.  (Giger Decl., Ex. 9 ¶ 1.)
Thus, even if, as Universal unpersuasively argues, the cure provisions of Rule 17(a) are not available
to the Heirs, the rights at issue plainly now reside with the Heirs, who (as they always have been) are
indisputably the real parties in interest.

D.    The Rules Enabling Act Does Not Preclude Plaintiffs from Utilizing Rule 17(a)'s
Cure Provisions.

Betraying that its real-party-in-interest argument is nothing more than an attempt to escape
the consequences of its contractual defaults, Universal argues that the Heirs are precluded from
utilizing the cure procedures of Rule 17(a) because allowing the Heirs to do so would "impermissibly
expand New York substantive contract-law rights" in violation of the Rules Enabling Act.  (Def's
Mem. at 13.)  Pursuant to that Act, Congress granted the Supreme Court "the power to prescribe
general rules of practice and procedure . . . for cases in the United States district courts" but declared
that "[s]uch rules shall not abridge, enlarge or modify any *substantive* right."  28 U.S.C. § 2072
(emphasis added).  According to Universal, the Heirs' are precluded from employing the cure
provisions of Rule 17(a) because such use would contradict the unremarkable proposition of New
York Law that "only parties to a contract and third-party beneficiaries may sue to enforce a contract."
(Def's Mem. at 7, 13.)  Universal is wrong:  the cure procedures of Rule 17(a) are available to the
Heirs.

*(i)  Rule 17 Applies Because Standing is Procedural*.

In Hanna v. Plumer, 380 U.S. 460 (1965), the Supreme Court established the proper test for
determining when federal procedural rules apply in lieu of conflicting state rules.  The Hanna Court
observed that the federal courts have been "instructed to apply the Federal Rule, and can refuse to do
so only if the Advisory Committee, this Court, and Congress erred in their prima facie judgment that
the Rule in question transgresses neither the terms of the Enabling Act nor constitutional

20

restrictions." Hanna, 380 U.S. at 471. Hanna and its progeny hold that the Federal Rules properly apply to all "matters which, though falling within the uncertain area between substance and procedure, are *rationally capable* of classification as either." Hanna, 380 U.S. at 472 (emphasis added); Kelly v. Crown Equip. Co., 970 F.2d 1273, 1277 (3d Cir. 1992) (same; the court "must apply 'the federal rules so long as they can rationally be viewed as procedural'"); Midwest Fin. Acceptance Corp. v. SE-Fish Assocs., 2000 U.S. Dist. LEXIS 7920, at * 9-10 (W.D.N.Y. 2000) (same).

Universal incorrectly argues that New York's common-law view of contractual standing should override Fed. R. Civ. P. 17(a). This might be true if rules of standing were not "rationally capable" of classification as procedural. But standing clearly is a procedural issue, as several courts have held. See, e.g., Hess v. United States Surgical Corp., No. C 99-2118 MJJ, 1999 U.S. Dist. LEXIS 12658, at * 4 (N.D. Cal. 1999) (applying federal law rather than state law because "the issue of [plaintiff's] standing seems more procedural than substantive); Gen. Motors Corp. v. Courier Servs., Inc., 77 Civ. 6128, 1978 U.S. Dist. LEXIS 16120, at * 4 (S.D.N.Y. 1978) (holding that the Federal Rules "override state law" on issue of standing because the issue is "sufficiently procedural rather than substantive"); Lapides v. Doner, 248 F. Supp. 883, 897-98 (E.D. Mich. 1965) (applying Rule 17(a) and holding that "standing is a procedural matter and not a matter of state substantive law binding on a Federal Court"). At the very least, standing is "rationally capable of classification" as procedural. Hanna, 380 U.S. at 472. As a result, Rule 17(a) applies, and the Heirs should be permitted to avail themselves of the Rule's cure provisions.

### (ii)   *Universal's Case Authority Is Inapposite.*

In arguing that application of Rule 17(a) in this case violates the Rules Enabling Act, Universal relies primarily on Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber, 407 F.3d 34, 49-50 (2d Cir. 2005). (Def's Mem. at 12-16.) That case is readily distinguishable. In Stichting, the legal malpractice claim

asserted by the plaintiff had been assigned to the plaintiff by a third party that did not appear in the action.  See id. at 41.  The Second Circuit held that the assignment violated the "long-standing" and settled law of New Jersey that "for reasons of public policy, tort claims generally are not assignable." Id. at 46.  Thus, the Court held that permitting ratification of the plaintiff's commencement of the action by the assignor, the real party in interest, would enlarge state substantive rights, *i.e.*, would give effect to a transfer of property that was illegal under New Jersey substantive law.  See id. at 47-48.

Similarly, in Scheufler v. Gen. Host Corp., 126 F.3d 1261 (10th Cir. 1997), also relied upon by Universal  (Def's Mem. at 15), the Tenth Circuit upheld the District Court's rejection of a Rule 17(a) ratification because such ratification "would have amounted to an assignment of [the real parties'] tort claims against defendant, a result that would have violated Kansas law."  Id. at 1272. As in Stichting, permitting ratification would have violated state substantive law by purporting to endorse a transfer of claims that was illegal under state law.

In contrast to Stichting and Scheufler, Universal does not, nor could it in good faith, suggest that JM's ratification of the Heirs' assertion of the Contract Rights violates state substantive law. Rather, Universal argues that New York *procedural* law concerning contract standing should trump Rule 17(a).  There is no support for this argument.[8]

If Universal's Rules Enabling Act analysis were correct, then the federal courts in New York would be guilty of routinely violating the Act by permitting cure of real-party-in-interest defects in breach of contract cases.  See, e.g., Wells Fargo N.W. Bank v. Varig S.A., 02 Civ. 6078 (JSR), 2003 U.S. Dist. LEXIS 10812, at * 8-9 (S.D.N.Y. 2003) (permitting ratification of breach of contract

---

[8] In any event, the Court of Appeals in Scheufler and, on remand, the District Court in Stichting, permitted plaintiffs to join the alleged real party in interest in lieu of ratification.  See Saybolt Int'l B.V. v. Schreiber, 279 F. Supp. 2d 337, 339 (S.D.N.Y. 2003); Scheufler, 126 F.3d at 1270.  Yet Universal inexplicably has rejected the Heirs' offer to join JM, a cure measure that is endorsed both by the Rule and in the case authority upon which Universal itself relies.

claim);[9] MacMillan, Inc. v. Fed. Ins. Co., 741 F. Supp. 1079, 1086 (S.D.N.Y. 1990) (permitting plaintiff 30 days to remedy a real-party-in-interest defect with its breach of contract claim "through appropriate procedures, including joinder, substitution. [or] ratification . . . ."); B.R.I. Coverage Corp. v. Air Canada, 725 F. Supp. 133, 136-37 (E.D.N.Y. 1989) (permitting the real party in interest to ratify plaintiff's assertion of a claim for breach of contract for delivery of goods); Am. Dredging Co. v. Fed. Ins. Co., 309 F. Supp. 425, 429 (S.D.N.Y. 1970) (finding that plaintiff was not the real party in interest but permitting plaintiff to proceed by joining the real party in interest pursuant to Rule 17(a) within 30 days).   Universal has offered no persuasive basis to invalidate these decisions by holding Rule 17(a) inapplicable to all New York breach of contract actions. [10]

---

[9] Indeed, the Wells Fargo case contains facts closely analogous to those asserted by Universal here: the plaintiffs were alleged to have "assigned all their relevant rights" to an absent third party, whom defendants argued was the real party in interest. See Wells Fargo, 2003 U.S. Dist. LEXIS 10812, at * 7-8. The Wells Fargo court held that plaintiffs could nonetheless proceed because the absent third party had ratified their actions by "confirming its approval of plaintiffs' exercise of remedies" and agreeing "to be bound by any determination reached" in the case. Id. This Court should reach the same conclusion here, and permit the Heirs to proceed on the basis that they have "cured" any real-party-in-interest defect under Rule 17(a).

[10] The other cases cited by Universal are also easily distinguishable.  In two of the cases, there was no conflicting state law at issue.  Instead, the Courts found that application of the federal rules transgressed particular provisions of federal legislation.  See Del Re v. Prudential Lines, Inc., 669 F.2d 93 (2d Cir. 1982) (Def's Mem. at 13-14; Longshoreman's and Harbor Workers Compensation Act); Eden Toys, Inc. v. Florelee Undergarment Co., 697 F.2d 27 (2d Cir. 1982) (Def's Mem. at 14; United States Copyright Act).  The distinction is meaningful:  Since Congress is empowered to establish procedural rules for the federal courts, statutory requirements made applicable by Congress to specific circumstances trump conflicting federal rules of procedure.  In such circumstances, none of the federalism issues that underpin the Hanna analysis and mandate that federal procedural rules trump state law procedures are present.

The final case relied upon by Universal did not even involve a Rules Enabling Act issue.  See United States for the Use and Benefit of Wulff v. CMA, Inc., 890 F.2d 1070, 1074-75 (9th Cir. 1989).  In Wulff, the court found that Rule 17(a) had been "distorted by [plaintiff] to circumvent the limitations period." Id. at 1075.  Noting that "there was no difficulty and no mistake in determining who was the proper party to bring suit," the Wulff court held that plaintiffs nonetheless commenced the action knowing they were not the real party in interest in order to avoid a limitation period. Id.  Under those unique circumstances, the court understandably exercised its discretion to reject efforts at ratification of an improperly commenced action.  But those circumstances do not exist here:  Universal's position that JM is the real party in interest is far from evident, and the Heirs plainly did not engage in procedural gamesmanship in instituting this action.  Universal's suggestion to the contrary  (Def's Mem. at 16-20), borders on the frivolous.

## CONCLUSION

For the reasons set forth above, the Court should find that plaintiffs, not Jobim Music, are the owners of the Contract Rights under the Sub-Publishing Agreements and are thus the real parties in interest in this action.  If, however, the Court declines to reach this conclusion on the present record, the Court should hold, at the very least, that there exist material issues of disputed fact, identified and discussed above, as to whether plaintiffs are the real parties in interest.  Finally, even if the Court determines that, as a matter of law, Jobim Music is the real party in interest, the Court should hold either that Universal waived its objection or that plaintiffs have cured any defect pursuant to Rule 17(a) and through the Qualified Assignment.  Under any of these alternative scenarios, the Court should deny defendant's Motion for Summary Judgment.

Dated:  New York, New York
      September 13, 2007                  ROSENBERG & GIGER P.C.

                                  By: _____
                                     John J. Rosenberg (JR 5292)
                                     Matthew H. Giger (MG 3731)
                                     488 Madison Avenue, 10th Floor
                                     New York, NY 10022
                                     (212) 705-4824

                                     *Attorneys for Plaintiffs*

24

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 13th day of September 2007, I caused a true and correct copy of the foregoing Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment to be served upon Andrew H. Bart, Esq., and Carletta Flora Higginson, Esq., Jenner & Block LLP, 919 Third Avenue, 37th Floor, New York, NY 10022, counsel for defendant, via this Court's electronic filing system.

MATTHEW H. GIGER