UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

ANA BEATRIZ LONTRA JOBIM, PAULO    :
HERMANNY JOBIM, ELIZABETH HERMANNY:
JOBIM and MARIA LUIZA HELENA LONTRA :
JOBIM,                                :
          Plaintiffs,         :
                               :
     -against-          :
                               :
SONGS OF UNIVERSAL, INC.,    :
                               :
                               :
       Defendant.        :
                               :
--------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 6, 2010

OPINION and ORDER

05 Civ. 3527 (PAC)

Related Case: 06 Civ.06407 (PAC)

HONORABLE PAUL A. CROTTY, United States District Judge:

In the 1960s, two popular Brazilian songwriters, Antonio Jobim and Vinicius de Moraes, authored Portuguese compositions ("Compositions"), including some world-famous famous songs, such as "The Girl from Ipanema" and "How Insensitive."[1]  To market the Compositions, Antonio Jobim and Vinicius de Moraes entered into a series of subpublishing agreements between 1962-1973 (the "Subpublishing Agreements") with the predecessors-in-interest of Defendant Songs of Universal, Inc., (Songs of Universal, Inc. together with its predecessors-in-interest, "Universal").[2]  The Subpublishing Agreements granted Universal certain limited rights to exploit the Compositions in exchange for paying royalties to Antonio Jobim and Vinicius de Moraes.  This case represents two separate breach-of-contract actions (the "Jobim Action" and the "VM Action," and together, the

---

[1] The Compositions are: (i) "Samba de Uma Nota So" (ii) "Corcovado" (iii) "Meditacao" (iv) "Garota de Ipanema" (v) "Insensatez" (vi) Esquecendo Voce (vii) "Sabia" (viii) "Canto de Ossanha" (ix) "Consolacao" (x) "Luciana" (xi) "Medo de Amar" (xii) "O Canto de Oxum" (xiii) "Rosa de Hiroshima" (xiv) "Sambo da Bencao. Antonio Jobim and Vinicius de Moraes worked both independently and collaboratively.  The Compositions "Garota de Ipanema" and "Insensatez" are common to both Antonio Jobim and Vinicius de Moraes.  The Compositions "Samba de Uma Nota So," "Corcovado," "Meditacao," "Esquecendo Voce" and "Sabia" are unique to Antonio Jobim.  The Compositions "Canto de Ossanha," "Consolacao," "Luciana," "Medo de Amar," "O Canto de Oxum," "Rosa de Hiroshima," and "Samba da Bencao" are unique to Vinicius de Moraes.

[2] Universal's predecessors-in-interest are Leeds Music Corporation ("Leeds"); Duchess Music Corporation ("Duchess"); and MCA Music Holland ("MCA").

1

"Actions") arising from the Subpublishing Agreements.  Antonio Jobim died in 1994, Vinicius de Moraes in 1980.  The Plaintiffs in the Actions are the successors-in-interest to Antonio Jobim and Vinicius de Moraes ("Jobim";[3] "VM";[4] and together, "Plaintiffs").  The Plaintiffs allege claims for multiple violations of the Subpublishing Agreements.

Jobim initiated its Action on April 5, 2005.  VM initiated its Action on August 23, 2006.  The claims in the Actions overlap partially.  On January 29, 2007, the Court (i) bifurcated the pre-trial proceedings into two phases: a liability phase and a damages phase, and (ii) consolidated the Actions for the limited purposes of discovery as to the liability phase (Dkt # 21 in 1:05-cv-3527.)

The parties have concluded the liability phase of the discovery and now bring motions for partial summary judgment.  Specifically, before the Court are: (i) Jobim's motion for partial summary judgment; (ii) VM's motion for partial summary judgment; and (iii) Universal's cross-motion for partial summary judgment against both Jobim and VM.

## BACKGROUND

## a. The Contracts between the Parties

This case centers on the interpretation of certain provisions in the Subpublishing Agreements.[5] Under the Subpublishing Agreements, Plaintiffs granted to Universal certain limited rights in the Compositions.  These rights included: the exclusive rights to sell copies of the Compositions in specified geographical territories ("Licensed Territories"); issue exclusive performance and mechanical licenses in the Licensed Territories; and issue non-exclusive world-wide synchronization licenses for motion pictures and television productions originating in the Licensed Territories (Lehman Affirmation "Aff'm.," Ex. 3, at ¶2.)

---

[3] Antonio Jobim's successors-in-interest are Ana Beatriz Lontra Jobim, Paulo Hermanny Jobim, Elizabeth Hermanny Jobim, and Maria Luiza Helena Lontra Jobim.
[4] Upon his death, Vinicius de Moraes's heirs succeeded to his interest in the Compositions.  Vinicius de Moraes's heirs then formed a corporation, V.N. Producoes, Publicidade Participacoes, Ltd., which represents the plaintiff in the VM Action.
[5] The Subpublishing Agreements are reproduced in Ex. 3 of the Lehman Aff'm. Supp. (Dkt # 37 in 1:06-cv-6407.)

The Subpublishing Agreements gave Universal the right to assign and transfer its rights under the Subpublishing Agreement to any of its subsidiaries or affiliates in the Licensed Territories (Lehman Aff'm., Ex. 3, at ¶6); but in assigning and transferring its rights under the Subpublishing Agreements to foreign affiliates and subsidiaries, Universal would remain liable for the full amount of Plaintiffs' royalties (Lehman Aff'm., Ex. 3, at ¶6.)

In exchange for these rights in the Compositions, the Subpublishing Agreements required Universal to pay royalties to the Plaintiffs.  Specifically, the Subpublishing Agreements provide that Universal pay Plaintiffs: (i) 10% of the retail price of any copies sold in the Licensed Territories, and (ii) 50% of "all monies earned" for synchronization licenses (Lehman Aff'm., Ex. 3, at ¶3.)   The Subpublishing Agreements further provide that: (i) "The mechanical rights shall be divided on the basis of: 50% (fifty per cent) of all mechanical rights to the owners [Plaintiffs] and 50% (fifty per cent) of all mechanical rights to the SUB-PUBLISHER [Universal]," and that (ii) "All broadcasting and performing fees . . . will be divided on the basis of: 6/12 for the original owners [Plaintiffs] 6/12 for the new owners [Universal]" (Lehman Aff'm., Ex. 3, at ¶3.)   Finally, the Subpublishing Agreements provide that Plaintiffs receive "fifty (50%) per cent of all monies earned from any other source whatsoever in connection with the said compositions" (Lehman Aff'm., Ex. 3, at ¶3.)

In addition to these rights in the Compositions, Plaintiffs also granted Universal the right to create new adaptations of the Compositions with Plaintiffs' consent (Lehman Aff'm., Ex. 3, at ¶4.) This included the right to produce English lyric versions of the Compositions.  Pursuant to this provision, and shortly after the parties executed the Subpublishing Agreements, Universal hired Norman Gimbel ("Gimbel") to compose English lyrics for four of the Compositions (the "English Lyric Versions").  Plaintiffs consented to this arrangement.

To this end, Universal entered into songwriter agreements with Gimbel dated April 24, 1963 (the "Songwriter Agreements").[6] The Songwriter Agreements required Universal to pay Gimbel 16 2/3% royalties for mechanical and synchronization licenses issued for the English Lyric Versions (Lehman Aff'm. Supp., Ex. 4, at ¶2.)

In addition to providing for a reduction in royalty rates for the English Lyric Versions, the Songwriter Agreements further provided that Universal would retain the copyrights to the English lyrics, title, and music for the original term of the copyrights, i.e., through 1991 (Lehman Aff'm., Ex. 4, at ¶1.)

The Songwriter Agreements, however, do not indicate whether the renewal rights in the English Lyric Versions would revert to Gimbel in 1991. This contractual ambiguity regarding reversionary rights in the English Lyric Versions triggered a series of disputes between Universal and Gimbel over royalty payments.

Since Gimbel's royalties would reduce Universal's royalties for the English Lyric Versions, Plaintiffs and Universal executed an appendix to the Subpublishing Agreements (the "Appendix"). In the Appendix, Plaintiffs and Universal agreed to a reduced royalty rate of 40% (down from 50%) for money collected from the English Lyric Versions (Lehman Aff'm., Ex. 3, Appendix ¶3.)[7]

In the Appendix, the Plaintiffs also reserved the right to terminate the Subpublishing Agreements (the "Termination Provision") (Lehman Aff'm., Ex. 3, Appendix ¶4.) Under the Termination Provision, the Plaintiffs had the right to terminate the Subpublishing Agreements upon written notice of breach, followed by a sixty-day cure period, and, upon Universal's failure to cure, thirty days written notice of termination (Lehman Aff'm., Ex. 3, Appendix ¶4.)

---

[6] The Songwriter Agreements are reproduced in Ex. 4 of the Lehman Aff'm. Supp. (Dkt #37 in 1:06-cv-6407.)
[7] The Appendix to the Subpublishing Agreements are identical for all the Compositions, except for the Appendix to the "Song of the Sabia," which does not reduce Plaintiffs' royalties for the English Lyric Versions (see Jobim Aff. Ex. A, at 46) (Dkt # 64 in 1:05-cv-3527.)

In May 1991, near the expiration of the original term of the copyrights in the English Lyric Versions, VM entered into an agreement with Universal (the "May 1991 Agreement," and together with the Subpublishing Agreements, the "Agreements"),[8] in which VM transferred to Universal all of its copyright interests in the Compositions for the United States (Bart. Decl. Ex. C, at ¶2.)  In exchange, Universal agreed to pay VM royalties according to the rates set out in the Subpublishing Agreements, as well as a one-time payment of two hundred thousand dollars. (Bart. Decl. Ex. C, at ¶5.)

On November 27, 1995, Gimbel and Universal entered into a settlement and release agreement to settle their disputes over royalty payments (the "1995 Gimbel Agreement").[9]  Under the 1995 Gimbel Agreement, Universal agreed to raise Gimbel's royalty rate from 16 2/3% to 50% for all English Lyric Versions.  The 1995 Gimbel Agreement further entitled Gimbel to collect his share of the royalties directly from the licensees, and to administer "any composition which utilizes both the music and [Gimbel's] English lyrics . . . throughout the Universe" (Lehman Decl. Opp'n, Ex. 9, at ¶3.) Finally, the 1995 Gimbel Agreement provided that for instrumental Compositions containing an English title but not English lyrics (the "English Title Instrumental Versions"), Gimbel would not be permitted to collect his share directly, but would receive an increase in his royalty rate from 16 2/3% to 33 1/3% (Lehman Decl. Opp'n, Ex. 9, at ¶4.)

The 1995 Gimbel Agreement, however, did not resolve the disputes between Universal and Gimbel, and in 1999, both parties submitted to arbitration.  Gimbel prevailed in the arbitration proceedings.  Pursuant to the arbitration award, the parties amended the 1995 Gimbel Agreement, (the "1999 Gimbel Amendment," and together with the 1995 Gimbel Agreement, the "Gimbel Agreements").[10]  The 1999 Gimbel Amendment entitled Gimbel to a royalty rate of 41.66% for both the English Lyric Versions and the English Title Instrumental Versions (Lehman Aff'm. Supp., Ex. 13, at ¶4.)  The 1999 Gimbel Amendment also entitled Gimbel to administer his 41.66% share directly for

---

[8] The May 1991 Agreement is reproduced in Ex. C of the Bart. Decl. (Dkt # 59 in 1:05-cv-3527.)
[9] The 1995 Gimbel Agreement is reproduced in Ex. 9 of the Lehman Decl. in Opp'n. (Dkt # 43 in 1:06-cv-6407.)
[10] The 1999 Gimbel Amendment is reproduced in Ex. 13 of the Lehman Aff'm. Supp. (Dkt # 37 in 1:06-cv-6407.)

both the English Lyric Versions and the English Title Instrumental Versions (Lehman Aff'm. Supp., Ex. 13, at ¶¶C-1–2.)

In May 2000, to ensure that Gimbel received his 41.66% share directly, Universal issued a directive to all licensees to pay Gimbel his share directly (the "Universal Gimbel Directive").  At the same time, Jobim conducted a royalty audit (the "Royalty Audit") for the period spanning 1995-2000.

On December 15, 2000, Jobim and Universal (but not VM) entered into standstill agreements (the "Standstill Agreements") that, effective December 12, 2000, tolled the running of "any and all statute of limitations (statutory and/or contractual) with respect to any and all claims and causes of action which Jobim may have against Universal" (Bart Decl. Ex. V.)[11]  The Standstill Agreements further provided that during the tolling period "neither party shall sue the other" (Bart Decl. Ex. V.) Jobim and Universal continuously extended the Standstill Agreements through March 2, 2005.

### b. The Plaintiffs' Claims at Issue in these Motions

Before the Court are each of Plaintiffs' motions for partial summary judgment and Universal's cross-motion for partial summary judgment.  The Plaintiffs' claims at issue on these motions are:  (I) breach of contract against Universal resulting from Universal's improper calculation and collection of royalties.  Specifically, the Plaintiffs claim that: (i) Universal improperly reduced their royalties for the English Title Instrumental Versions; (ii) Universal improperly calculated royalties based on a "net receipts" calculation rather than an "at source calculation" (There are two ways to calculate Plaintiffs' royalties: "net receipts" and "at source."  Under a "net receipts" arrangement, Plaintiffs would collect royalties based upon income received by Universal after foreign administration fees have been deducted.  Under an "at source" arrangement, by contrast, Plaintiffs would collect royalties based on a percentage of income determined before licensing fees are deducted, i.e., the total amount received for the license "at the source"); (iii) Universal improperly reduced Plaintiffs' royalties as a result of the Gimbel Agreements (the "Gimbel Deduction"); and (iv) Universal failed to pay Plaintiffs their portion

---

[11] The Standstill Agreements are reproduced in Ex. V of the Bart Decl. (Dkt # 59 in 1:05-cv-3527.)

of black box income.  (Black box income is a lump sum that foreign copyright societies remit to authors and publishers, based on excess operating funds they collect against their operating budget ("Black Box Income")).[12]

In addition to the Plaintiffs' claims relating to royalty underpayments, Jobim asserts two other breach of contract claims: (II) Universal breached the Subpublishing Agreements by licensing the Compositions in territories outside the Licensed Territories ("Extraterritorial Licensing"); and (III) Universal breached the Subpublishing Agreements by assigning to Gimbel certain administrative rights in the Compositions (the "Gimbel Assignments").

Finally, Plaintiffs also seek (IV) declaratory judgments that the Agreements are invalid. Specifically, Jobim seeks (a) a declaration that the Subpublishing Agreements are invalid under a termination provision in the Subpublishing Agreements.  Similarly, VM seeks (b) the equitable relief of rescission as to the May 1991 Agreement, which incorporated the royalty provisions of the Subpublishing Agreements.

**Summary Judgment Standard**

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure where "there is no genuine issue as to any material fact" such that "the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A genuine issue for trial exists if a reasonable trier of fact could return a verdict for the non-moving party based on the record as a whole. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if it would affect the outcome of the suit. Anderson, 477 U.S. at 249.

---

[12] The four claims cataloged here are common to both Jobim and VM.  These are the only claims relating to royalty payments relevant to the parties' summary judgment motions.  In addition to these claims, Jobim's Complaint also alleges that Universal failed to collect the total amount of royalties in foreign territories and that Universal misrepresented ownership of the Compositions in foreign agency lists.  Similarly, VM's Complaint alleges that Universal: failed to provide accurate royalty statements; failed to negotiate, collect, or remit to VM royalties at the appropriate rates; improperly collected directly from foreign collection societies; failed to provide VM with information regarding foreign taxes; and refused to allow VM the right to perform a royalty audit.  VM's Complaint further alleges that Universal breached two implied covenants of the May 1991 Agreement: (i) the covenant of good faith and fair dealing, and (ii) the covenant to make reasonable efforts to exploit the Compositions and maximize VM's income.

In deciding a summary judgment motion, the Court must not engage in fact-finding or credibility weighing, but rather the Court must determine whether any material questions of fact are in dispute after resolving all ambiguities and drawing all justifiable inferences in favor of the non-moving party. Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 150 (2000).  The non-moving party seeking to avoid summary judgment must set forth specific facts showing a genuine issue for trial, see Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 248, and must offer "concrete evidence from which a reasonable juror could return a verdict in [his] favor." Distasio v. Perkin Elmer Corp., 157 F.3d 55, 62 (2d Cir. 1998).

## DISCUSSION

## I. Failure to Pay Royalties

### i. Improper Reduction for the English Title Instrumental Versions

Plaintiffs allege that Universal breached the Agreements by paying reduced royalty amounts for the English Title Instrumental Versions.  Under New York law, courts begin interpreting contracts by analyzing whether the contract is ambiguous. Law Debenture Trust Co. of New York v. Maverick Tube Corp. 595 F.3d 458, 465 (2d Cir. 2010).[13] A contract is unambiguous when the contractual language "has 'a definite and precise meaning, unattended by danger of misconception in purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." Id., at 467.  Since "[t]he best evidence of what parties to a written agreement intend is what they say in their writing . . . a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Greenfield v. Phillies Records, Inc. 98 N.Y.2d 562, 569 (2002).   "[E]xtrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the court to decide." Id.  The consideration of extrinsic evidence is generally reserved for the jury, however if a court is "convinced that the interpretation

---

[13] The parties concede throughout their briefs that New York law applies to the Agreements.

offered by the moving party is the only one which can fairly and reasonably be attributed to the document," then summary judgment is warranted. Wing Ming Properties, Ltd. v. Mott Operating Corp., 148 Misc. 2d 680, 684 (N.Y. Sup. Ct. 1990) aff'd, 79 N.Y. 2d 1021(N.Y. May, 1992).

Paragraph 3 of the Appendix provides that Universal pay Plaintiffs a reduced royalty amount for the English Lyric Versions (Lehman Aff'm., Ex. 3.) This provision is unambiguous: a lyric is not a title; the royalty reduction applies only to English Lyric Versions; the contract does not mention English Title Instrumental Versions.

Universal does not dispute that it paid Plaintiffs the reduced royalty rate (40%) for both English Title Instrumental Versions and English Lyric Versions (Def. 56.1 Statement at ¶23, dkt # 56 in 1:05-cv-3527.) Universal maintains, however, that differentiating between the English Title Instrumental Versions and the English Lyric Versions is impossible.

Universal's own conduct belies its arguments. From 1995-1999, Universal distinguished between English Title Instrumental Versions and English Lyric Versions to satisfy the 1995 Gimbel Agreement, which provided that Gimbel was entitled to 33 1/3% royalties for English Title Instrumental Versions, but 50% for English Lyric Versions. Further, for a brief period in 1998-1999, Universal configured its accounting system to distinguish between English Title Instrumental Versions and English Lyric Versions. Universal stopped making this distinction only after it entered into the 1999 Gimbel Amendment, under which Gimbel received the same rate (41.66%) for both English Title Instrumental Versions and English Lyric Versions. Indeed, Universal admitted in deposition that it was possible to distinguish between English Title Instrumental Versions and English Lyric Versions for royalty purposes (Lehman Aff'm. Ex. 35, 207–09.)

Universal further argues that because it remitted the reduced royalty rate to Plaintiffs for over thirty years for both English Lyric Versions and the English Title Instrumental Versions, it has established a consistent course of dealing that justifies paying the reduced royalty rate even for the English Title Instrumental Versions. Universal's argument, however, relies on extrinsic evidence,

irrelevant to the Appendix's unambiguous terms. Accordingly, the Court finds that Universal breached the Agreements by paying the Plaintiffs a reduced royalty rate for English Title Instrumental Versions.

**ii. 'Net Receipts' Versus 'At Source'**

Plaintiffs argue that Universal breached the Subpublishing Agreements by basing its royalties on a "net receipts" rather than an "at source" calculation. Applying a "net receipts" calculation, Universal deducted foreign affiliate fees before calculating Plaintiffs' royalty percentage. Plaintiffs argue that this calculation improperly reduced their royalties since the Subpublishing Agreements entitle them to an "at source" royalty calculation. Under an "at source" calculation, Universal would calculate Plaintiffs' royalties as a percentage of the amount that the Compositions actually generated, i.e. without deducting foreign affiliate fees from the pot.

In support of their argument, Plaintiffs point to Paragraph 3(c) of the Subpublishing Agreements, which provides that Universal pay Plaintiffs "Fifty (50%) per cent of all monies earned for the licensed territory." Plaintiffs argue that the broad contractual language – "all monies earned" – supports an "at source" reading.

The phrase "all monies earned," however, is ambiguous. It may entitle Plaintiffs to fifty percent of money earned by Universal's foreign affiliates ("at source"), but it may also entitle Plaintiffs only to a percentage of monies earned by Universal after fees have been paid ("net receipts"). Read as a whole, however, the Subpublishing Agreements clearly support a "net receipts" interpretation. Unlike paragraph 3(c), which states that Universal will pay Plaintiffs a fifty percent rate, paragraphs 3(d) and 3(e) state expressly that the parties will split the income for mechanical, broadcasting and performance licenses at fifty percent each. Paragraphs 3(d) and 3(e) demonstrate that the overall thrust of the Subpublishing Agreements was to create an equal royalty distribution between the parties. This equal distribution between the parties would be possible only under a "net receipts" arrangement; an "at source" arrangement would allow Plaintiffs to collect a greater percentage than Universal since Universal would be forced to absorb all of the foreign affiliate fees.

The Appendix to the Subpublishing Agreement further supports this interpretation.  Paragraph 3 of the Appendix reduces Plaintiffs' royalties for the English Lyric Versions.  This reduction applies equally to the royalties specified in both paragraphs 3(c) (synchronization licenses) and 3(d) (mechanical licenses).  The Appendix thus indicates that the two paragraphs – 3(c) and (3d) – should be read together.  If paragraphs 3(c) and 3(d) are to be consistent, then the express language in paragraph 3(d), directing an even division, must govern over the ambiguous phrase "all monies earned" in paragraph 3(c).  Therefore, since an "at source" arrangement would not allow for an even distribution between the parties, the phrase "all monies earned" means "net receipts," not "at source."

Since the term "all monies earned" is ambiguous, the court may look to extrinsic evidence in interpreting the Subpublishing Agreements.  Such extrinsic evidence includes the contracting parties' course of performance.  See Record Club of America, Inc. v. United Artists Records, Inc., No.72 Civ. 5234, 1991 WL 73838, at *10 (S.D.N.Y April 29, 1991) (noting that a course of performance is weighty evidence of a party's intent in entering a contract).

Here, the parties' course of performance over an extensive period favors Universal's "net receipts" construction of the Subpublishing Agreements.  The parties entered into the Subpublishing Agreements between 1962-1973.  Universal's royalty statements have always utilized a "net receipts" arrangement.  Plaintiffs, represented by sophisticated counsel and accounting advisors, failed to object to this calculation.  After receiving "net receipts" royalty payments for over thirty years, and failing to object, Plaintiffs cannot now argue for an "at source" royalty arrangement.

Plaintiffs contend that, despite the extended duration of the parties' contractual relationship, the parties have not established a course of performance.  Plaintiffs argue that they were unaware that Universal was applying a "net receipts" calculation since Universal's royalty statements were obscure. In fact, Universal's employees testified that Universal's royalty statements did not indicate whether its calculations were based on "net receipts" or "at source."  See e.g., Dep. of A. Sargueta, Lehman Aff'm. Ex. 37, 81-82.

Defendants' claimed lack of awareness is not sufficient to rebut the conclusions to be drawn from a course of performance over an extensive period of time. Evans v. Famous Music Corp., 1 N.Y.3d 452, 459 (2004) (finding decades-long relationship between parties to a contract sufficient to establish a course of performance despite absence of plaintiff's awareness that defendants were not paying plaintiff foreign tax credits). See also Continental Casualty Co. v. Rapid-American Corp., 80 N.Y.2d 640, 651 (1993) (holding that courts may imply awareness of a course of performance to a contracting party).

Finally – in addition to the overall language of the Subpublishing Agreements and the parties' decades-long course of performance – the custom in the music industry at the time the parties executed the Subpublishing Agreements favors the "net receipts" interpretation. "When trade usage is widespread, there is a presumption that the parties intended its incorporation by implication, unless the contract negates this implication." 28 N.Y. Prac., Contract Law § 9:25.  Here, experts in the music industry testified that the industry custom at the time the parties executed the Subpublishing Agreements was to form "net receipts" deals.  Specifically, Irwin Griggs, Vice President of Special Projects for Universal, who has been in the music publishing industry for 47 years, testified that the industry custom was 'net receipts' deals (Bart Decl. ¶ 10, Ex. F.)  Likewise, John McKellan, former president of MCA (one of Songs of Universal, Inc.'s predecessors-in-interest), testified that "everything was net receipts in those days" (Bart Decl. ¶ 9, Ex. E.)

Plaintiffs have not rebutted Universal's facts regarding industry practice.  Instead, Plaintiffs point to paragraph 6 of the Subpublishing Agreements and introduce extrinsic evidence to place paragraph 6 in its original context.  Paragraph 6 of the Subpublishing Agreements gives Universal the right to assign and transfer its rights under the Subpublishing Agreement to any of its subsidiaries or affiliates in the Licensed Territories, but Universal need not reduce Plaintiffs' royalties by assigning and transferring its rights to foreign affiliates and subsidiaries.  Indeed, this was precisely the arrangement that Duchess and Leeds (Song of Universal's predecessors-in-interest) had with their

foreign affiliates (see Lehman Aff'm. Ex. 6).  Placing paragraph 6 in its original context, Plaintiffs argue that the parties intended an "at source" arrangement, which is why the Subpublishing Agreements did not allow Universal to deduct foreign affiliate fees from Plaintiffs' royalty share and instead required Universal to calculate Plaintiffs' royalty percentage as generated "at source."

Paragraph 6 has no application here, however, since Songs of Universal, Inc., the party to this lawsuit, did not trigger it.  It is undisputed that, unlike Duchess and Leeds, Songs of Universal, Inc. did not transfer and assign its rights under the Subpublishing Agreements to its foreign affiliate and subsidiaries; rather, Songs of Universal, Inc. merely licensed its rights to its foreign affiliates and subsidiaries under an inter-company agreement (Allen Decl. at ¶¶ 11-12, dkt # 71 in 1:05-cv-3527.)

The Court finds that the totality of the evidence, both intrinsic and extrinsic, indicates that a "net receipts" arrangement is the only reasonable interpretation of the Subpublishing Agreements.  The language of the Subpublishing Agreements demonstrates that the parties intended to effect an equal royalty distribution.   The parties' lengthy course of conduct buttresses this interpretation, as does the prevailing custom of the music industry at the time the parties executed the Subpublishing Agreements.  Accordingly, the Court finds that Universal has not breached the Subpublishing Agreements by calculating Plaintiffs' royalties based on "net receipts."

**iii. The Gimbel Deduction**

Universal's negotiations with Gimbel changed the way Universal calculated Plaintiffs' royalty share.  Under the 1995 Gimbel Agreement, Gimbel collected his share of the royalties directly for the English Lyric Versions, and after the 1999 Gimbel Amendment, Gimbel collected his share of the royalties directly for both the English Lyric Versions and the English Title Instrumental Versions.  As such, the Gimbel Agreements resulted in a reduction of Plaintiffs' royalty share.[14]  Plaintiffs argue that the Gimbel Deductions impermissibly reduced their royalty share.[15]

---

[14] Prior to the 1999 Gimbel Amendment, for example, Universal collected 100% of the income for the English Title Instrumental Versions.  After the 1999 Gimbel Amendment, Universal paid Plaintiffs only after Gimbel collected his

Universal concedes that the Gimbel Deductions impermissibly reduced Plaintiffs' royalties. Several high-placed Universal officials testified to inter-company discussions to account for ("gross-up") the reduced royalty amounts due to Gimbel's deductions.[16]   In fact, beginning with the January 2005 royalty statement, Universal applied a "rate uplift" to account for the reduced royalties (Def. Resp. to VM 56.1 Statement at ¶17, dkt # 46 in 1:06-cv-6407.)[17]

Universal's rate uplift, however, does not absolve Universal from liability arising from the Gimbel Deductions.  Indeed, it demonstrates that Universal's conduct was not permissible under the contracts.  Universal applied the "rate uplift" only in January 2005; five years after the 1999 Gimbel Amendment became effective.  Moreover, Universal implemented the "rate uplift" only on a going-forward – not retroactive – basis.  Universal did not retroactively compensate Plaintiffs for the Gimbel Deductions until 2008, a few years after Plaintiffs initiated their lawsuits.[18]  Accordingly, the Court finds that Universal breached the Subpublishing Agreements by instituting the Gimbel Deductions and failing to compensate Plaintiffs for their corresponding loss.

---

41.66% share.  Consequently, the Plaintiffs received a percentage of 58.33%, rather than a percentage of 100%, on both the English Lyric Versions and the English Title Instrumental Versions.

[15] Jobim asserts that Universal breached the Subpublishing Agreements by granting Gimbel rights "throughout the Universe," even though Universal's licensing rights in the Compositions were limited to the Licensed Territories.  Jobim claims that this grant impermissibly reduced its royalties.  Universal does not dispute that the Gimbel Agreements grant Gimbel rights "throughout the Universe."  Universal argues, however, that Gimbel has never exercised its rights outside of the Licensed Territories because Gimbel interpreted "throughout the Universe" to mean the Licensed Territories only.  Universal's argument goes to damages, rather than liability.

[16] These include comments by: Ed Arrow, Director of Universal's copyright department (Lehman Aff'm, Ex. 34, at 101); Irwin Griggs, Universal's Vice President of Special projects (see Lehman Aff'm, Ex. 35, Griggs 66), Anthony Saragueta, Universal's Vice President of Royalties (Lehman Aff'm, Ex. 35, Griggs 66), and Kirk Wentzell, Universal's Director of Royalty Review (Lehman Aff'm, Ex. 39 at 76–77.)

[17] Specifically, instead of paying Plaintiffs 20% each (a combined 40%) on Compositions subject to the Gimbel Deductions, Universal paid Plaintiffs 34.28%, trying to neutralize the effect of the Gimbel Deductions on Plaintiffs' royalties (34.29% x 58.33% equals the contractual rate of 20% of the total income) (Def. Resp. to VM 56.1 Statement at ¶17.)  The parties give inconsistent dates for the initiation of Universal's rate uplift as well as the number of years the Plaintiffs were underpaid.  VM alleges that it was underpaid for four years, from 2000-2003, until the rate uplift was applied in January 2004 (VM 56.1 Statement at ¶18, dkt # 44 in 1:06-cv-6407).  Jobim, however, alleges that it was underpaid from July 1, 2000 through December 31, 2004 (Jobim 56.1 Statement at ¶ 26, dkt # 62 in 1:05-cv-3527.)  Like Jobim, Universal states that it implemented the rate uplift effective January 1, 2005 (Def. Resp. to VM 56.1 Statement at ¶17, dkt # 46 in 1:06-cv-6407.)

[18] Even then, Universal underpaid Plaintiffs since Universal calculated the compensatory amount based on a 20% royalty rate for the English Title Instrumental Versions (Lehman Aff'm Supp., Ex. 21).  Since the English Title Instrumental Versions were not subject to the reduced rate applied in paragraph 3 of the Appendix, Universal should have paid Plaintiffs royalties of 25%, not 20%.

**iv. Black Box Income**

Plaintiffs argue that the Subpublishing Agreements entitle them to Black Box Income. Plaintiffs point to paragraph 3(f) of the Subpublishing Agreements, which provide that Universal pay Plaintiffs "fifty (50%) per cent of all monies earned from any other source whatsoever in connection with the said compositions."  Plaintiffs argue that this broad contractual language includes Black Box Income since the Compositions generate Black Box Income.  Universal contends, however, that paragraph 3(f) does not entitle Plaintiffs to Black Box Income since Black Box Income is not allocable to any specific composition, and is therefore not "in connection" with the Compositions.

Black Box Income is calculated based on the relative uses of each Composition.  It therefore represents monies earned "in connection" with the Compositions, even if it the income is not allocable to any specific Composition.  Accordingly, Universal breached the Subpublishing Agreements by failing to pay Plaintiffs Black Box Income.

**v. Equitable Estoppel Defense**

Universal argues that the doctrine of equitable estoppel bars all of Plaintiffs' claims relating to royalty collection.  Under New York law, to prevail on a defense of equitable estoppel, Universal must demonstrate "(1) an act constituting a concealment of facts or a false misrepresentation; (2) an intention or expectation that such acts will be relied upon; (3) actual or constructive knowledge of the true facts by the wrongdoers; (4) reliance upon the misrepresentations which causes the innocent part to change its position to its substantial detriment." Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Am., 618 F. Supp. 2d 280, 297 (S.D.N.Y. 2009).

Universal cannot satisfy the elements of equitable estoppel.  Plaintiffs did not carry out any affirmative act, let alone an act that involved concealment or misrepresentation.  Universal merely failed to carry out its own affirmative obligation to pay royalties in accordance with the Subpublishing Agreements.  Universal therefore did not rely on any of Plaintiffs' acts, undermining Universal's equitable estoppel defense.

## II. Breach of Contract – Extraterritorial Licensing

Jobim alleges that Universal licensed its rights in the Compositions outside the Licensed Territories.  Jobim maintains that Universal's Extraterritorial Licensing gives rise to two distinct, but related claims.  First, Jobim claims that Universal's Extraterritorial Licensing itself violated the Subpublishing Agreements.[19]  Jobim further claims that Universal failed to pay its royalties based on income generated from the extraterritorially-licensed Compositions.  Universal has conceded that it licensed the Compositions outside the Licensed Territories and fails to set forth any legal defense for its breach.[20]  Accordingly, the Court finds that Universal breached the Subpublishing Agreements by licensing the Compositions extraterritorially.

## III. Assignment to Gimbel

Jobim claims that Universal violated the Subpublishing Agreements by transferring its rights in the Compositions to Gimbel.  Universal concedes that Gimbel had reversionary rights only in the lyrics – but not in the actual music – of the English Lyric Compositions (see Def. Mem. Opp'n, at 5.) Nevertheless, in executing the Gimbel Agreements, Universal granted Gimbel rights in both the lyrics and the music of the English Lyric Compositions. (Lehman Aff'm Opp'n, Ex. 9 at ¶3; Lehman Aff'm Supp. Ex. 13 at ¶ 2.)  These grants exceeded the scope of Universal's rights in the Compositions.

Universal's rights in the Compositions derived exclusively from the Subpublishing Agreements.  Under the Subpublishing Agreements, Universal was only a licensee – not a copyright owner.  Paragraph 6 of the Subpublishing Agreements granted Universal the right to transfer and assign its rights in the Compositions.  That right, however, was limited to Universal's foreign affiliates

---

[19] Specifically, Jobim asserts that Universal violated the Subpublishing Agreements by licensing the Compositions in Hong Kong, Taiwan, Malaysia, Singapore, Korea, Mexico, Chile, Argentina, and Colombia.  Universal disputes that it was not entitled to issue licenses in Hong Kong.  Jobim's Extraterritorial Licensing claim relates to all the Compositions except Esquecendo Voce (Jobim Compl. ¶40, dkt # 2 in 1:05-cv-3527.)

[20] For example, Ed Arrow, director of Universal's Copyright Department, stated in deposition that, "[I]t was determined that we collected money in territories that were not define [sic] as territories under the agreement for at least one song, maybe more." (Arrow Tr. 153:20-24, Giger Decl. Ex. 5, Dkt # 65 in 1:05-cv-3527) Arrow also acknowledged that Universal was registered with copyright societies in Taiwan, Malaysia, Singapore and Korea to receive income generated from "Girl from Ipanema." (Id. at 359:14–360:24)

and Subsidiaries, not to unrelated third parties, such as Gimbel.  Universal's assignment of copyright interests to Gimbel thus violated the Subpublishing Agreements.

Universal contends that the Gimbel Assignment did not exceed the scope of the Subpublishing Agreements since the Gimbel Agreements arose out of disputes over the Compositions and the Subpublishing Agreements authorized Universal to settle Composition-related disputes on behalf of Plaintiffs (Lehman Aff'm Supp. Ex. 3, at ¶10.)

Universal's authority to enforce and protect the Plaintiffs' rights in the Compositions does not justify the Gimbel Assignments.  Plaintiffs authorized Universal to settle Composition-related disputes on its behalf; Plaintiffs did not authorize Universal to assign rights it did not possess to third parties and thereby deprive Plaintiffs of its rights in the Compositions.  Accordingly, the Court finds that Universal breached the Subpublishing Agreements through the Gimbel Assignments.[21]

## IV. Declaratory Judgment

Both Jobim and VM seek declaratory judgment relief.  The nature of their requests, however, differs.  Jobim requests that the Court declare the Subpublishing Agreements invalid because Jobim complied with the requirements of the Subpublishing Agreements' Termination Provision.  VM, by contrast, seeks the equitable relief of rescission and asks that the Court declare the May 1991 Agreement invalid in light of Universal's breaches.

## (a) Jobim – Termination of Subpublishing Agreements

Paragraph 4 of the Appendix provides as follows:

In the event that the SUB-PUBLISHER [Universal] fails to comply with any of the terms and conditions herein contained, the publisher [Plaintiffs] has the right to require [Universal] to do so by notifying [Universal] to that effect by registered letter, and unless [Universal] shall comply within sixty (60) days following the receipt of the

---

[21] The Court therefore grants Jobim's motion with the exception of only one of the disputed territories.  Universal contends that the collection of royalties in Hong Kong were within its rights under the Subpublishing Agreements that permitted exploitation in "all English speaking countries," based on its belief that Hong Kong is an English speaking country.  Jobim, in contrast, maintains that Hong Kong is not an English speaking country.  This is a question of fact for the jury that may not be determined on a summary judgment motion.

registered letter, [Plaintiffs] shall have the right to terminate this agreement upon thirty days written notice to [Universal].

Jobim argues that it has satisfied these requirements and is therefore entitled to judgment declaring the Subpublishing Agreements invalid.

While it is correct to recognize contractual provisions calling for termination on notice, Red Apple Child Devlp't Center v. Community School Districts Two, 303 A.D.2d 156, 157 (1st Dep't 2003), it is also true that the notice provision must be complied with.

Here the facts show that Jobim sent a Notice of Breach to Universal dated February 1, 2005 (Giger Decl. Supp., Ex. 16.).  However, instead of giving sixty (60) days to cure, followed by thirty (30) days notice, Jobim initiated its Action on April 5, 2005.

Jobim failed to comply with the Termination Provision, and given its failure to do so, Jobim has no right to terminate. Filmline (Cross-Country) Productions, Inc. v. United Artists Corp., 865 F.2d 513 (2d Cir. 1989) (noncompliance with notice provision renders termination inoperative).  While the Court has found various breaches of the Subpublishing Agreements with respect to the calculation of certain royalties, and further breaches with respect to the Gimbel Agreements and the extraterritorial application of the Subpublishing Agreements, there are questions of fact as to how material these breaches are.  Furthermore, in light of the parties' long history of dealing with one another, Universal's consistent accounting practices, and Jobim's knowing or easily obtainable knowledge of the accounting practices about which it now complains, granting Jobim's declaratory judgment that it is entitled to contract termination would not be equitable in these circumstances.

Accordingly, the Court denies Jobim's request for declaratory judgment relief as to the invalidity of the Subpublishing Agreements.

**(b) VM – Rescission of the May 1991 Agreement**

In the May 1991 Agreement between VM and Universal, VM transferred to Universal all of its United States copyright interests in the Compositions and Universal agreed to pay VM royalties

18

according to the royalties set forth in the Subpublishing Agreements.  Since Universal has underpaid VM's royalties, VM asks the Court to exercise its equitable powers and rescind the May 1991 Agreement.

Under New York law, "rescission of a contract is an extraordinary remedy," Nolan v. Sam Fox Publishing Co., 499 F.2d 1394, 1397 (2d Cir. 1974), and should not be granted unless a party to a contract can demonstrate either that (i) the breach was "material and willful," or, (ii) "so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." Calanan v. Powers, 199 N.Y. 269, 284, 92 N.E. 747 (1910).

VM moves for summary judgment only on its claims relating to Universal's underpayment of royalties.  Universal's breaches regarding royalty payments, however, is not material since it was only partial; Universal paid some royalties to VM. See Nolan, 499 F.2d at1399–1400 (2d Cir. 1974) (holding that a partial breach for underpayment of royalties is immaterial).  Since Universal's breach was immaterial, the Court may not rescind the May 1991 Agreement.

## V. Statute of Limitations

The statute of limitations limits the scope of Plaintiffs' recovery.  New York applies a six-year statute of limitations to breach of contract claims. N.Y. Civ. Prac. L. & R. § 213(2).  For statute of limitations purposes, a cause of action for breach of contract begins to run at the time of breach, even if a plaintiff is unaware of the cause of action at that time. Roberts v. Plottel, 1996 WL 306570 (S.D.N.Y. 1996).  Where, as here, a contract "requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew." Faulkner v. Arista Records LLC, 602 F. Supp. 2d 470, 478 (S.D.N.Y. 2009) (holding that the continuing obligation to pay royalties triggered a new cause of action with each royalty statement).

The statute of limitations applies differently for Jobim and VM.  VM initiated its Action on August 23, 2006.  Any of VM's claims that accrued prior to August 23, 2000, are therefore time-barred.  Jobim, by contrast, initiated its Action on April 5, 2005.  Jobim's claims reach back more than

six years since, unlike VM, Jobim executed a series of Standstill Agreements with Universal.  The Standstill Agreements, effective from December 12, 2000 through March 2, 2005, tolled the running of "any and all statute of limitations (statutory and/or contractual) with respect to any and all claims and causes of action which Jobim may have against Universal."  Accordingly, the six-year-period goes back to January 12, 1995.

The parties do not dispute these applications of the statute of limitations. <u>See</u> Def. Mem. Supp. at 21 n.9; VM's Mem. Opp'n at 22; Jobim Mem. Opp'n at 17.  Jobim and VM aruge, however, that the Court should equitably toll the statute of limitations.

Under New York law, a defendant may be equitably estopped from raising a statue of limitations defense. New York Gen.Oblig.Law § 17-103(4)(b) (McKinney 2010).  This is generally a question of fact for the jury. <u>Carter v. Goodman Group Music Publishers</u>, 848 F. Supp. 438 (S.D.N.Y. 1994).  However, the statute of limitations may be tolled only in cases where the defendant's conduct was "calculated to mislead a plaintiff." <u>Id.</u> at 443.  Here, the Plaintiffs have not demonstrated that Universal intended to mislead them and summary judgment is therefore appropriate. <u>See id.</u> at 444.

Accordingly, the Court declines to equitably toll the six-year statute of limitations.  Therefore, Jobim may recover only for breaches that occurred after January 12, 1995, and VM may recover only for breaches that occurred after August 23, 2000.

<u>**CONCLUSION**</u>

For the reasons set forth above, Plaintiffs' and Defendant's motions for partial summary judgment (document # 55 and #60) are GRANTED in part and DENIED in part.  Specifically,

i.   Plaintiffs' motions as to underpayment of royalties resulting from Universal's improper royalty reduction on English Title Instrumental Versions are GRANTED.  Universal's motion as to underpayment of royalties resulting from Universal's improper royalty reduction on English Title Instrumental Versions is DENIED.

ii.    Plaintiffs' motions as to underpayment of royalties resulting from Universal's application of a "net receipts" rather than an "at source" royalty calculation are DENIED.  Universal's motion as to underpayment of royalties resulting from Universal's application of a "net receipts" rather than an "at source" royalty calculation is GRANTED.

iii.    Plaintiffs' motions as to underpayment of royalties resulting from the Gimbel Deduction are GRANTED.  Universal's motion as to underpayment of royalties resulting from the Gimbel Deduction is DENIED.

iv.    Universal's motion as to underpayment of royalties resulting from non-payment of Black Box Income is DENIED.

v.    Jobim's motion as to Universal's extraterritorial licensing is GRANTED (with the exception of Universal's licensing in Hong Kong, which is DENIED).

vi.    Jobim's motion as to the Gimbel Assignment is GRANTED.  Universal's motion as to the Gimbel Assignment is DENIED.

vii.    Jobim's motion for declaratory judgment as to the invalidity of the Subpublishing Agreements is DENIED.

viii.    VM's motion for rescission of the May 1991 Agreement is DENIED.

This Order ends the consolidation of the two Actions.  The parties are directed to submit a Civil Case Management Plan for each of the Actions in accordance with the Court's Individual Practices.

The Civil Case Management Plan will govern the liability phase of discovery on any outstanding issues of the Actions. The Clerk of Court is directed to terminate all pending motions in the two above-referenced cases.

Dated:  New York, New York
      August 6, 2010

SO ORDERED

PAUL A. CROTTY
United States District Judge